# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **LARRY KERMIT TAYLOR,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:16cv00044 |
| | ) | |
| **NANCY A. BERRYHILL,**[1] | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Larry Kermit Taylor, ("Taylor"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011), following a redetermination hearing, held pursuant to 42 U.S.C. § 405(u). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

In Counts I through VII of his Complaint, Taylor challenges the legality of the procedure used to redetermine his eligibility for DIB benefits pursuant to 42 U.S.C. § 405(u). In these counts, Taylor argues that the redetermination procedure violated his due process rights under the Fifth Amendment, the Administrative

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Berryhill is substituted for Carolyn W. Colvin, the previous Acting Commissioner of Social Security.

Procedures Act, the Social Security Act and the Social Security regulations. He also argues that the redetermination did not occur "immediately" as required by 42 U.S.C. § 405(u). In Count VIII of his Complaint, Taylor argues that the Commissioner's decision that he was not disabled was not supported by substantial evidence.

The record shows that Taylor filed an application for DIB on July 1, 2010, alleging disability as of June 23, 2010. (Record, ("R."), at 263-66.) He hired Eric C. Conn, a then-prominent Social Security practitioner in the region, as his attorney. When Taylor's claim was initially denied on August 18, 2010, he sought reconsideration. (R. at 115-26.) Thereafter, on October 20, 2010, Taylor's request for reconsideration also was denied. (R. at 127-29.) Taylor then requested a hearing before an Administrative Law Judge, ("ALJ"). (R. at 134.) On January 7, 2011, Taylor underwent a consultative examination by Dr. Srini Ammisetty, M.D., arranged by Conn. (R. at 525-27.) Taylor was awarded DIB benefits by decision dated February 2, 2011, by ALJ David B. Daugherty and entered without a hearing. (R. at 9, 106-09.) ALJ Daugherty's favorable decision was based, in part, on the examination and report of Dr. Ammisetty.

On May 12, 2015, the Social Security Administration's, ("SSA" or "Agency"), Office of the Inspector General, ("OIG"), informed SSA that it had reason to believe fraud was involved in applications for benefits for approximately 1,800 individuals, including Taylor, whose cases involved evidence from Bradley Adkins, Ph.D., Dr. Srini Ammisetty, M.D., Dr. Frederic Huffnagle, M.D., or Dr. David P. Herr, D.O., dated between January 2007 and May 2011. (R. at 337.) More specifically, OIG had reason to believe that Conn, or his law firm, submitted precompleted "template" residual functional capacity forms, some of which were from Dr. Ammisetty, between January 2007 and May 2011, in support of these

individuals' applications for benefits. On May 18, 2015, the Appeals Council informed Taylor it was redetermining the decision granting him DIB benefits on or before February 2, 2011. (R. at 153-56.) The Appeals Council further notified Taylor that the OIG directed it to disregard any evidence from Dr. Ammisetty when that information was submitted by Conn or representatives associated with his law firm. (R. at 153.) The Appeals Council explained that Dr. Ammisetty had provided evidence in his case that ALJ Daugherty used to find him disabled, and the ALJ relied solely on Dr. Ammisetty's medical source statement and did not evaluate any other evidence or medical opinions. (R. at 154.) Without considering Dr. Ammisetty's residual functional capacity form, the Appeals Council concluded that there was not sufficient evidence in the file to show that Taylor was disabled on or before February 2, 2011, the date Taylor previously had been awarded benefits. (R. at 154-55.) The Appeals Council invited Taylor to submit additional evidence or statements and granted his request for an extension of time within which to do so. (R. at 155, 159.) Taylor did submit additional medical evidence in June 2015.

In August 2015, after reviewing the additional evidence or statements supplied by Taylor, the Appeals Council set aside the prior favorable decision and remanded Taylor's case to a different ALJ for further action and a new decision. (R. at 111-14.) The Appeals Council gave Taylor an opportunity for a hearing before another ALJ, ALJ Gavras, and an opportunity to testify and submit evidence that was new, material and related to the period at issue. Taylor elected to appear and testify at the April 2016 hearing with the assistance of counsel. (R. at 30-74.) As a result of that redetermination hearing, ALJ Gavras, by decision dated April 21, 2016, found there was insufficient evidence to support Taylor's entitlement to DIB benefits at the time he was originally awarded them. (R. at 12-16.)

The ALJ found that Taylor met the insured status requirement of the Act for DIB purposes through December 31, 2011. (R. at 12.) The ALJ also found that Taylor had not engaged in substantial gainful activity during the period from his alleged onset date of June 23, 2010, through February 2, 2011, the date Taylor previously was awarded benefits.[2] (R. at 13.) The ALJ found that the medical evidence established that Taylor suffered from the following medically determinable impairments during the relevant period: hypertension; hyperlipidemia; and fatty liver infiltration, but he found that Taylor did not have a severe impairment or combination of impairments. (R. at 13.) Thus, the ALJ found that Taylor was not under a disability as defined under the Act from June 23, 2010, through February 2, 2011, and was not eligible for benefits. (R. at 16.) *See* 20 C.F.R. § 404.1520(c) (2017). That being the case, the ALJ terminated Taylor's benefits and notified him that SSA may treat any benefits previously received as overpayments, but that he could request that any such overpayment be waived. (R. at 16.) Upon Taylor's request, the Agency waived the $116,167.70 overpayment in DIB benefits that Taylor had received.

Taylor requested review of the ALJ's decision, (R. at 5), which the Appeals Council denied on September 7, 2016. (R. at 1-3.) Taylor then filed the present action on November 3, 2016, to appeal the Commissioner's unfavorable redetermination decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2017). He challenges not only the merits of the Agency's decision, but also raises challenges to the redetermination procedure as set out in the Act. This case is before the court on Taylor's motion for summary judgment

---

[2] *See* Hearings, Appeals & Litigation Law Manual, ("HALLEX"), I-1-3-25, which states that, when redetermining a claim, the relevant period is from the alleged onset date to the date of previous award. In HALLEX, the Deputy Commissioner of Disability Adjudication and Review defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the hearing, Appeals Council and civil action levels. *See* HALLEX I-1-0-1.

filed May 4, 2017, and the Commissioner's motion for summary judgment filed June 19, 2017.

On June 1, 2015, during the pendency of Taylor's redetermination, he filed new claims for DIB and SSI. Although, typically, a claimant can have only one active claim at a time, the Commissioner is allowing former clients of Conn to file new claims during the redetermination of their old claims because the two claims generally cover different time periods. The redetermination is limited to the period that was previously awarded, while the new claims cover the period afterwards. On October 14, 2016, the SSA denied Taylor's DIB claim, finding that his date last insured was December 31, 2012,[3] and his treatment records did not show disability as of that date. (Docket Item No. 17-2.) However, on October 28, 2016, the Agency awarded Taylor's SSI claim because it found him disabled as of June 1, 2015. (Docket Item No. 17-3.) He currently is receiving SSI benefits in the amount of $191.31 per month. Taylor is seeking review before the Agency of the denial of DIB benefits.

## II. Facts[4]

The court finds it necessary to include a description of the unusual circumstances leading up to the redetermination of Taylor's prior DIB award. The record shows that the government indicted Conn, ALJ Daugherty and Dr. Bradley Adkins in an 18-count indictment returned on April 1, 2016. Dr. Ammisetty was not indicted. *See United States v. Conn, et al.*, No. 5:16-cr-22 (E.D. Ky. Apr. 1,

---

[3] In the ALJ's decision, ALJ Gavras had found that Taylor's date last insured was December 31, 2011, not 2012. Thus, it appears that this is a typographical error in the 2016 denial.

[4] Taylor's substantive arguments on appeal focus on his back impairment. Therefore, the court also will focus largely on the evidence related to these complaints.

2016). (Docket Item No. 17-5.) On March 24, 2017, Conn pled guilty in federal court to his role in a scheme to defraud the Agency. *See United States v. Conn*, No. 5:17-cr-43 (E.D. Ky. Mar. 24, 2017). (Docket Item No. 17-6.) Conn agreed to a factual basis to support his plea, including that he submitted the falsified medical documents, and former SSA ALJ Daugherty authored decisions granting disability benefits in nearly 1,800 claimants' cases. (Docket Item No. 17-7.) Conn admitted he paid medical professionals to sign medical forms that he fabricated before evaluations of claimants occurred. According to his guilty plea, Conn routinely prepared, and medical professionals signed, evaluation reports indicating that claimants had limitations considered disabling by the SSA, irrespective of the claimants' actual physical or mental conditions. On or about June 2, 2017, Conn removed his electronic monitoring device while under house arrest and fled his home, about a month before his scheduled July 2017 sentencing. *See* www.kentucky.com/news/state/article156523654.html (last visited Feb. 15, 2018). In July 2017, Conn was sentenced in absentia to 12 years in prison. Law enforcement apprehended him on December 2, 2017, in Honduras. The original 18-count indictment against Conn remains in effect, and the government intends to prosecute him pursuant to it, in addition to escape and related charges. *See* www.kentucky.com/news/state/article189653509.html (last visited Feb. 15, 2018).

Taylor was born in 1955, which classified him as a "person of advanced age" under 20 C.F.R. § 404.1563(e) during the relevant time period. (R. at 39.) He has a ninth-grade education and past relevant work experience as a truck driver. (R. at 40-41.)

At his April 2016 hearing, Taylor testified that he last worked as a coal truck driver in 2010. (R. at 42-43.) He stated that he quit working because he "couldn't do [his] job to satisfy the people that [he] was working for." (R. at 43.) He stated

that he had to stop and walk around for 15 or 20 minutes every two or three hours due to back pain and leg numbness and pain. (R. at 43-44, 58.) Taylor testified that he broke his tailbone and was off work for about two months, after which time he had experienced low back pain. (R. at 45.) He stated that he could not afford to go to the doctor, and he explained that is why he did not take pain medications and why there are not many medical records in his file relating to the relevant time period. (R. at 45-46.) Nonetheless, Taylor stated that he went to the doctor a few times, but they could not determine the cause of his problems. (R. at 45.) He said that, prior to 2011, he was told he had a few deteriorated discs, a "spot" on his liver and a lot of stomach problems, carpal tunnel syndrome in both wrists and fingers, which caused numbness, and high blood pressure, which was controlled fairly well with medications. (R. at 46, 51, 58-59.) Taylor stated that he did only what he had to do at home, including mowing the yard if there was no one else to do it. (R. at 46-47.) He stated that he could stand for 30 to 45 minutes without experiencing back pain. (R. at 47.) Taylor stated that he would lie down on the couch a lot in an effort to relieve his pain. (R. at 48.) He stated that he could drive if he had to. (R. at 49.)

Taylor also testified that he experienced mood swings, depression, anxiety and nervousness, but he did not seek any mental health treatment because he could not afford it. (R. at 59.) He also stated that he never had to seek emergent treatment for such mental health issues. (R. at 59.)

Taylor's daughter, Kayla Taylor, also testified at this hearing. (R. at 61-63.) She stated that she was 18 years old in 2010 and lived with her father. (R. at 62.) Kayla Taylor stated that her father was in a lot of pain all the time, and he could not work as long of hours as he had previously. (R. at 62.) She stated that he complained of pain in his back, legs, arms and feet daily. (R. at 63.) Kayla Taylor

stated that when Taylor was home, he would alternate among the couch, the recliner and the bed. (R. at 62.) She testified that Taylor had to rest all weekend in order to be able to work the following week. (R. at 62.) Kayla Taylor stated that her father did not participate in any of her school-related activities. (R. at 62-63.)

Theresa Wolford, a vocational expert, also was present and testified at Taylor's hearing. (R. at 66-71.) Wolford classified Taylor's past work as a tractor trailer truck driver as medium[5] and semi-skilled work. (R. at 66.) Wolford testified that an individual who could perform simple, routine medium work would not be able to perform Taylor's past relevant work as a truck driver. (R. at 66-67.) However, she testified that such an individual could perform other jobs existing in significant numbers in the national economy, including those of a hand packager and a laundry worker. (R. at 67.) Wolford testified that a hypothetical individual who could perform the full range of light[6] work also could not perform Taylor's past work as a truck driver. (R. at 67-68.) Wolford testified that an individual who could perform simple, routine medium work, but who could sit for only two hours at a time, could perform the jobs previously enumerated. (R. at 68-69.) Likewise, she testified that if that individual could stand for only two hours at a time, he still could perform those jobs. (R. at 69.) Wolford testified that with unskilled work, typically, employers will tolerate being off task approximately 15 percent of the time in addition to regularly scheduled breaks. (R. at 70.) She further testified that employers typically tolerate one to two absences monthly at the unskilled level of work, noting that if the employee would need two absences on a monthly,

---

[5] Medium work involves lifting items weighing up to 50 pounds at a time and frequently lifting or carrying items weighing up to 25 pounds. If someone can perform medium work, he also can perform sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2017).

[6] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2017).

continuous basis, he would have difficulty maintaining competitive employment. (R. at 70.)

In rendering his decision, the ALJ reviewed medical records from Family Care Center; Clinch Valley Medical Center; Buchanan General Hospital; Dr. J.N. Patel, M.D.; Pikeville Medical Center; University of Virginia Digestive Health Clinic; Dr. Bert Spetzler, M.D., a state agency physician; and Dr. Joseph Duckwall, M.D., a state agency physician.

The record shows that Taylor received treatment at Family Care Center[7] from October 2008 through October 2015. On July 13, 2010, Taylor complained of elevated blood pressure, but he reported that he had stopped taking his medication. (R. at 357.) On physical examination, Taylor's blood pressure was 150/100, and he was alert and oriented with an appropriate affect. (R. at 357.) A physical examination was largely normal. (R. at 357.) Taylor could stand erect with a steady gait, despite a reported history of chronic back pain. (R. at 357.) However, Taylor stated that he was quitting his job because he could not stand the pain in his back. (R. at 357.) He was diagnosed with hypertension and a history of increased hyperlipidemia. (R. at 357.) On August 10, 2010, Taylor's blood pressure was 132/78. (R. at 371.) His abdomen was distended, but nontender, and the remainder of his examination was within normal limits. (R. at 371.) Taylor was diagnosed with hypertension, hyperlipidemia and elevated liver function tests. (R. at 371.) A liver ultrasound was ordered, and Taylor was advised to consume no alcohol. (R. at 371.)

Dr. Bert Spetzler, M.D., a state agency physician, completed an assessment

---

[7] Many of the treatment notes from Family Care Center are difficult to read or illegible. The court has done its best to decipher these notes.

in connection with Taylor's initial disability claim on August 6 and 9, 2010. (R. at 88-93.) After reviewing Taylor's medical records, Dr. Spetzler concluded that he did not suffer from any severe impairments. (R. at 90.) Dr. Spetzler found that Taylor could perform his past relevant work as a truck driver. (R. at 92.) Dr. Spetzler specifically found that Taylor was receiving treatment for high blood pressure and high cholesterol, but neither of these conditions would prevent him from performing normal work activities. (R. at 92-93.) He further found that, although Taylor alleged back pain and pain and numbness in the legs, feet, arms and hands, there was no evidence of significant muscle weakness or nerve damage that would prevent him from working. (R. at 93.) Dr. Spetzler also found that, despite allegations of stomach problems, there was no evidence to indicate that Taylor had received treatment for this condition. (R. at 93.) Finally, Dr. Spetzler noted that, although Taylor was concerned about mood swings, depression and anxiety, the evidence did not indicate that he had ever received treatment for such conditions or that they would significantly affect his ability to remember, understand or communicate with others. (R. at 93.) Dr. Spetzler concluded that Taylor's condition did not result in significant limitations in his ability to perform basic work activities. (R. at 93.) Thus, he found that Taylor's condition was not disabling. (R. at 93.)

On August 19, 2010, an ultrasound of Taylor's liver revealed a small echo-poor mass in the right lobe, probably representing a hemangioma. (R. at 382-83.) It also revealed another larger echo-poor mass in the midline measuring roughly 5 x 6 centimeters, representing a mass probably arising from the pancreas or, less likely, the liver. (R. at 382.) A CT scan was recommended for further evaluation. (R. at 382.) This CT scan of Taylor's abdomen and pelvis was performed on August 30, 2010, and revealed low attenuation of the liver compatible with diffuse fatty liver infiltration. (R. at 381.) There also were multiple hepatic masses, the

largest of which was 8 centimeters in diameter and located in the left lobe. (R. at 381.) The appearance was most suggestive of multiple hemangiomata, but other possible etiologies included metastatic disease, multifocal hepatoma, focal nodular hyperplasia or adenomas, and an MRI was recommended for further confirmation. (R. at 381.)

On September 24, 2010, Taylor was seen at the University of Virginia Digestive Health Clinic for evaluation of liver lesions. (R. at 376-79.) Dr. Anshu Mahajan, M.D., reviewed the results of Taylor's diagnostic studies. (R. at 376.) Taylor's blood pressure was 129/69, and he was alert and oriented and in no acute distress. (R. at 377.) Taylor's abdomen was soft, nontender and nondistended with present bowel sounds. (R. at 377.) The liver edge was palpable. (R. at 377.) There was no clubbing, cyanosis or edema of the extremities. (R. at 377.) Dr. Mahajan concluded that Taylor's abnormal liver function tests were likely due to fatty liver. (R. at 377.) He opined that the masses on the CT scan probably represented hemangiomas, but their size was concerning. (R. at 377.) Dr. Mahajan stated that Taylor's case would be discussed at the Interdisciplinary Hepatology Tumor Board. (R. at 377.) He ordered lab work in anticipation of a possible liver biopsy. (R. at 377.) For Taylor's fatty liver, Dr. Mahajan recommended exercise, diet and alcohol abstinence. (R. at 377.) After discussing Taylor's diagnostic studies with the Interdisciplinary Hepatology Tumor Board, it was recommended that Taylor follow up with either a tagged red blood cell scan or another three-phase contrast CT scan in six months to evaluate for interval change or increase in size. (R. at 378.)

On October 14 and 18, 2010, Dr. Joseph Duckwall, M.D., a state agency physician, completed an assessment in connection with the reconsideration of Taylor's claims. (R. at 94-100.) After reviewing the medical evidence of record,

Dr. Duckwall found that Taylor did not suffer from any severe impairments and that he could perform his past relevant work as a truck driver. (R. at 97-99.) Dr. Duckwall further found that Taylor was receiving treatment for high blood pressure and high cholesterol, but neither of these conditions would prevent him from doing normal work activities. (R. at 99.) He further found that, despite Taylor's allegations of back pain and pain and numbness in the legs, feet, arms and hands, there was no evidence that he had significant muscle weakness or nerve damage that would prevent him from working. (R. at 99.) Dr. Duckwall also found that, despite allegations of stomach problems, there was no evidence to indicate that Taylor had received any treatment for such condition. (R. at 99.) With regard to his alleged mood swings, depression and anxiety, Dr. Duckwall noted that the evidence did not indicate that he had ever received treatment for such conditions or that they would significantly affect his ability to remember, understand or communicate with others. (R. at 99.) Dr. Duckwall concluded that Taylor's condition did not result in significant limitations in his ability to perform basic work activities and, therefore, was not severe enough to be considered disabling. (R. at 99.)

Taylor returned to Family Care Center on November 10, 2010, for medication refills. (R. at 439.) Physical examination at that time was within normal limits. (R. at 439.) Taylor was diagnosed with hyperlipidemia, hypertension, gastroesophageal reflux disease, ("GERD"), and low back pain, and he was continued on medications. (R. at 439.)

This is the entirety of the medical evidence from the time period relevant to the ALJ's redetermination decision. Taylor explains that there is a dearth of evidence during the relevant time period because he could not afford health insurance. However, once he received DIB benefits, he could afford it, and he

began receiving medical treatment more regularly. The evidence that follows is dated subsequent to the February 2, 2011, decision granting Taylor DIB benefits. The ALJ reviewed this evidence, but concluded that it did not relate to the time period relevant to the redetermination. Thus, this court also will consider this evidence in determining whether the ALJ's decision is supported by substantial evidence. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

On March 28, 2011, Taylor returned to Family Care Center. (R. at 437.) His blood pressure was 122/80. (R. at 437.) He was ambulatory with a steady gait, and he had no complaints of leg or muscle pain. (R. at 437.) Taylor was diagnosed with an upper respiratory infection, hypertension, GERD and hyperlipidemia, and he was prescribed antibiotics. (R. at 437.) In May 2011, Taylor had complaints of congestion, shortness of breath and a cough. (R. at 436.) His blood pressure was 112/70. (R. at 436.) A physical examination was normal, except for nasal congestion. (R. at 436.) Taylor had a full range of motion of the extremities, and he had normal reflexes. (R. at 436.) He was diagnosed with an upper respiratory infection and received antibiotics. (R. at 436.) On October 3, 2011, Taylor had no extremity edema, and his spine and gait were normal. (R. at 435.) He was diagnosed with hypertension and hyperlipidemia, and he was advised to continue his medications. (R. at 435.) On February 20, 2012, Taylor complained of head congestion, cough and GERD. (R. at 434.) He exhibited no extremity edema, and his spine and gait were, again, within normal limits. (R. at 434.) Taylor was diagnosed with hypertension, hyperlipidemia, GERD and an upper respiratory infection, and he received antibiotics. (R. at 434.) On July 11, 2012, Taylor complained of bilateral knee swelling, hypertension, GERD and arthralgias. (R. at 433.) His blood pressure was 130/84. (R. at 433.) On physical examination, Taylor had decreased range of motion in his knees, but his spine and gait were within

normal limits. (R. at 433.) He was diagnosed with hypertension, hyperlipidemia, GERD and bilateral knee pain, and x-rays of the knees were ordered. (R. at 433.) On May 10, 2013, Taylor complained of lower back pain with a burning sensation radiating into both legs and feet. (R. at 432.) He also complained of hypertension and myalgias/arthralgias. (R. at 432.) His blood pressure was 140/94, but Taylor stated that he had been out of his blood pressure medication for two days. (R. at 432.) He had a full range of motion of the extremities with no edema, normal reflexes and a steady gait. (R. at 432.) Taylor was diagnosed with hypertension, neuropathy and back pain, and x-rays of the lumbar spine were ordered. (R. at 432.) Taylor was prescribed Neurontin. (R. at 432.)

X-rays of Taylor's lumbar spine, taken on June 18, 2013, showed levoscoliosis with degenerative disc and joint disease. (R. at 451.) X-rays of Taylor's left foot, taken on November 19, 2014, showed severe arthritic changes at the medial malleolus and mild midfoot arthritic changes, but no definite acute bony abnormalities. (R. at 450.)

On July 2, 2013, Taylor returned to Family Care Center, complaining that Neurontin was not helping. (R. at 431.) He continued to complain of myalgias/arthralgias, and his blood pressure was 128/72. (R. at 431.) He had a full range of motion of the extremities with no edema and a steady gait. (R. at 431.) However, Taylor exhibited paraspinal muscle tenderness and pain and burning, which radiated into the bilateral lower extremities. (R. at 431.) Taylor was diagnosed with lower back pain, neuropathy in both lower extremities and polyarthropathy. (R. at 431.) He was prescribed Ultram, and his Neurontin dosage was increased. (R. at 431.) On August 21, 2013, Taylor's blood pressure was 107/62. (R. at 430.) He had a full range of motion and no edema of the extremities, and no gross neurological deficits were noted. (R. at 430.) Taylor was diagnosed

with allergic rhinitis, an upper respiratory infection, hypertension and hyperlipidemia. (R. at 430.) On November 25, 2013, Taylor complained of bilateral leg pain. (R. at 429.) His blood pressure was 130/90. (R. at 429.) It was noted that Taylor had chronic low back pain, which radiated into both lower extremities with burning and numbness. (R. at 429.) It also was noted that Taylor was limping. (R. at 429.) He was diagnosed with bilateral lower extremity pain and neuropathy. (R. at 429.) On February 26, 2014, Taylor's blood pressure was 140/98. (R. at 427.) He had a full range of motion of the extremities without edema, reflexes were normal, and no neurological deficits were noted. (R. at 427.) He was diagnosed with bronchitis, an upper respiratory infection and congestion. (R. at 427.) On March 22, 2014, a physical examination yielded normal findings. (R. at 423.) Taylor was diagnosed with neuropathy, hypertension, GERD and hyperlipidemia. (R. at 423.) On November 11, 2014, Taylor complained of left foot pain. (R. at 422.) His blood pressure was 140/90. (R. at 422.) A physical examination revealed a full range of motion of the extremities with no edema and normal reflexes. (R. at 422.) Taylor was diagnosed with polyarthropathy, bilateral knee pain, a left foot injury, left foot pain, low back pain, hypertension and neuropathy. (R. at 422.) A left foot x-ray was ordered. (R. at 422.)

On January 28, 2015, Taylor returned to Family Care Center. (R. at 421.) His blood pressure was 128/82. (R. at 421.) He was diagnosed with peripheral vascular disease, bilateral lower extremity pain, osteoarthritis, polyarthralgia and right knee pain. (R. at 421.) On February 10, 2015, bilateral ankle brachial indices were normal, and dedicated arterial imaging was recommended if symptoms were severe. (R. at 443.)

On February 13, 2015, Taylor saw Dr. J.N. Patel, M.D., for a consult for a colonoscopy. (R. at 391-93, 409-11.) He complained of left lower quadrant pain

for the previous three months, as well as constipation. (R. at 391, 409.) He described the pain as dull, aching and nonradiating, with no aggravating or relieving factors. (R. at 391, 409.) Taylor reported arthritis, back pain, joint pain and stiffness, but he denied headache, dizziness, tingling, numbness, anxiety, nervousness, depression and insomnia. (R. at 391, 409.) On physical examination, Taylor was alert and oriented and in no acute distress. (R. at 391, 409.) No deformities or muscle wasting was noted, but osteoarthritis was present. (R. at 392, 410.) Taylor had a normal gait and no joint dislocation, instability or subluxations. (R. at 392, 410.) Muscle strength was full, and he had a normal range of motion without pain or crepitus. (R. at 392, 410.) There was no clubbing, cyanosis or edema of the extremities, and knee, ankle and bicep tendon jerks were 2+. (R. at 392, 410.) There were 2+ dorsalis pedis and posterior tibial pulses, negative Homan's sign, and Taylor ambulated without difficulty. (R. at 392, 410.) He had normal respiratory, cardiovascular and neurological examinations. (R. at 392, 410.) Taylor's abdomen was soft and nondistended, without ascites and obvious hernias. (R. at 392, 410.) There was no tenderness, guarding or rebound tenderness to palpation. (R. at 392, 410.) There also was no evidence of hepatosplenomegaly, no palpable masses and no costovertebral angle, ("CVA"), tenderness. (R. at 392, 410.) Dr. Patel diagnosed Taylor with left lower quadrant abdominal pain, constipation, noninsulin dependent diabetes mellitus, hypertension, hyperlipidemia and osteoarthritis. (R. at 393, 411.) He ordered lab work and a colonoscopy. (R. at 393, 411.)

On February 20, 2015, Taylor was admitted to Buchanan General Hospital for a screening colonoscopy. (R. at 390, 395-96, 404-06.) He did well post-operatively and was discharged home. (R. at 390, 395, 404, 406.) Taylor was diagnosed with diverticulosis coli and mild inflammation of the cecum. (R. at 390, 395, 404, 406.) He returned to Dr. Patel on February 27, 2015, for a follow-up

appointment. (R. at 400-02.) Taylor was alert, oriented and in no acute distress. (R. at 400.) There were no deformities or muscle wasting, but osteoarthritis was present. (R. at 401.) A physical examination yielded the same findings as previously. (R. at 401.) Dr. Patel noted that Taylor's colonoscopy showed mild inflammation in the cecum, but a biopsy was negative. (R. at 402.) He diagnosed Taylor with left lower quadrant abdominal pain, constipation, chronic back syndrome, hyperlipidemia, hypertension and osteoarthritis. (R. at 402.) He recommended a high-fiber diet and a repeat colonoscopy in five years. (R. at 402.)

On March 11, 2015, Taylor returned to Family Care Center. (R. at 419.) Chronic bilateral lower extremity burning, tingling and numbness was noted. (R. at 419.) A physical examination was within normal limits. (R. at 419.) Taylor was diagnosed with osteoarthritis, hyperlipidemia, hypertension, polyarthropathy and neuropathy. (R. at 419.)

Taylor saw Dr. Belal Said, M.D., at Pikeville Medical Center on March 12, 2015, with complaints of joint pain, worse in the knees, legs and back and associated with subjective swelling. (R. at 484-91.) Taylor stated that the pain was worse with activities and decreased with rest. (R. at 484.) He also stated that it was worse in the evening and associated with numbness in the legs, without history of stool or urine incontinence. (R. at 484.) Taylor's blood pressure was 155/96. (R. at 485.) He rated his pain as a five on a 10-point scale. (R. at 486.) A physical examination was largely normal, except for crepitation of both knees and trace pitting edema of both lower extremities. (R. at 486.) Dr. Said diagnosed Taylor with joint pain, site unspecified, and he ordered lab work. (R. at 487.) Taylor was continued on his medications, which included aspirin and gabapentin. (R. at 487-88.) X-rays of Taylor's knees, taken on March 12, 2015, showed mild tricompartmental osteoarthritis in both knees. (R. at 414, 482.) A chest x-ray, taken

the same day, showed no acute cardiopulmonary process, but mild age-indeterminate wedge deformity of the L1 disc. (R. at 417, 480.) Taylor returned to Dr. Said on April 14, 2015, with complaints of joint pain in both legs, which he rated as a six on a 10-point scale. (R. at 492-99.) He described the pain as aching and burning, and he stated it was aggravated by walking and standing and was worse in the mornings. (R. at 492.) Taylor stated that the pain was relieved by medication. (R. at 492.) Taylor's blood pressure was 130/78. (R. at 493.) A physical examination was normal, except for a mildly reduced range of motion of the right elbow and crepitation of both knees. (R. at 494.) Dr. Said diagnosed Taylor with osteoarthrosis, unspecified whether generalized or localized, involving unspecified site, and he was advised to continue taking diclofenac. (R. at 494.)

Taylor returned to Family Care Center on August 17, 2015, with complaints of leg and finger cramps. (R. at 500.) He was alert and oriented with an appropriate affect. (R. at 500.) Taylor had a full range of motion of the extremities without edema, and he exhibited normal reflexes. (R. at 500.) He had increased burning and tingling in both lower extremities. (R. at 500.) He was diagnosed with lower back pain, polyarthropathy, neuropathy, hypertension and GERD. (R. at 500.) On September 23, 2015, Taylor's blood pressure was 112/72. (R. at 501.) He had bilateral knee crepitus and positive bilateral straight leg raise testing. (R. at 501.) Taylor was diagnosed with lower back pain, bilateral knee pain and polyarthropathy. (R. at 501.) His dosage of Norco was increased, and he was prescribed a course of prednisone. (R. at 501.) On October 9, 2015, Taylor again had bilateral knee crepitus, as well as paraspinal muscle tenderness. (R. at 502.) He was diagnosed with hyperlipidemia, lower back pain and polyarthropathy. (R. at 502.) On October 15, 2015, Taylor complained of achy and persistent pain in both legs and feet, which he rated as a six on a 10-point scale. (R. at 512.) He stated that it was aggravated by standing and relieved by rest. (R. at 512.) Taylor also

complained of increased pain in the hands with numbness, as well as knee pain, for which he was taking Norco. (R. at 512.) Although he was still taking diclofenac, he did not think it was helping. (R. at 512.) Taylor was diagnosed with polyosteoarthritis, unspecified, and carpal tunnel syndrome of the arm. (R at 512.) Diclofenac was discontinued, and he was prescribed nabumetone. (R. at 512.) Taylor was advised to try wrist braces for the carpal tunnel symptoms, and a nerve conduction study would be considered for both hands. (R. at 512.) A complete metabolic panel and sedimentation rate testing were ordered. (R. at 512.) On October 22, 2015, Taylor's blood pressure was 128/80. (R. at 503.) He had bilateral knee crepitus, as well as cervical spine, thoracic spine and lumbar spine paramuscle tenderness. (R. at 503.) He also complained of increased burning and tingling in the lower extremities and feet, which he rated a 10 on a 10-point scale. (R. at 503.) Taylor was diagnosed with lower back pain, osteoarthritis, bilateral peripheral neuropathy, polyarthropathy and sciatica. (R. at 503.) Spinal x-rays were ordered, and Taylor's dosage of Norco was increased. (R. at 503.)

On September 8, 2015, Taylor saw Dr. Nasreen Dar, M.D., a psychiatrist, for a psychiatric evaluation. (R. at 515-17.) He reported back pain for 12 to 15 years, but no history of back injury. (R. at 515.) Taylor stated that he had been diagnosed with degenerative disc disease in his back. (R. at 515.) He reported that his back continued to hurt, with pain radiating down both legs and a burning sensation in both feet. (R. at 515.) Taylor reported difficulty bending over, lifting heavy objects, sitting, standing or walking for too long. (R. at 515.) Taylor also reported diagnoses of hypertension and arthritis, for which he was taking medication. (R. at 515.) He further reported being nervous for the past several years, having difficulty dealing with stress, crowds, loud noises and children. (R. at 515.) He expressed feelings of irritability, depression and worry and having difficulty going to sleep and being restless during the night. (R. at 515.) Taylor

reported that his appetite was fair without any weight change. (R. at 515.) He reported feelings of hopelessness, helplessness and worthlessness, and he admitted to suicidal thoughts without definite plans or attempts. (R. at 515.) Taylor stated that when he became nervous or upset, he developed a headache, he smothered and he became sick to his stomach. (R. at 515.) He was not in treatment and had not taken any medication for his emotional difficulties. (R. at 515.)

On mental status examination, Taylor was cooperative, but withdrawn. (R. at 516.) His affect and mood were depressed and frustrated, but he was fully oriented. (R. at 516.) Taylor presented with a poverty of thoughts, had difficulty relating to the examiner, and his speech revealed frustration. (R. at 516.) Taylor's concentration also was impaired, as he was unable to recall any one when asked to name five recent United States presidents. (R. at 516.) Dr. Dar opined that his intellect was borderline. (R. at 516.) He had difficulty performing Serial 7's, but he was able to do a simulated purchase and make change for one dollar. (R. at 516.) Taylor's recent and remote memory was intact, and he had no difficulty repeating or recalling during the interview. (R. at 516.) There were no signs or symptoms of organic brain syndrome. (R. at 516.) Taylor's impersonal judgment was questionable, and he responded to proverbs in a concrete manner. (R. at 516.) His general fund of knowledge was poor. (R. at 516.) Dr. Dar opined that Taylor had a fair amount of insight into his difficulties, but a low amount of self-esteem. (R. at 516.) He did not appear to have any auditory or visual hallucinations during the interview, and he did not present with delusional thinking, ideas of reference or loose associations. (R. at 516.) Dr. Dar diagnosed Taylor with severe neurotic depression; back pain; and low intellect, and she deemed his prognosis guarded. (R. at 516.) She concluded that he continued to have physical and emotional difficulties and did not appear to be able to tolerate much stress or handle any gainful employment. (R. at 517.) Dr. Dar further opined that Taylor was not a good

candidate for vocational rehabilitation. (R. at 517.) She recommended that he seek psychiatric follow-up treatment. (R. at 517.)

Taylor returned to Dr. Dar on October 22, 2015, stating that he was not doing well emotionally. (R. at 518-19.) He reported difficulty dealing with stress and concentrating and not sleeping well, but he was eating "fair," he was in touch with reality, and he was able to relate and take part in chores and activities. (R. at 518.) Taylor complained of excessive crying, fatigue, night sweats, tiredness and weight gain. (R. at 518.) He also complained of palpitations and rapid heart rate, back pain, joint pain, stiffness and swelling, leg cramps and muscle cramps, anxiety, change in sleep pattern, depression, early awakening, being easily irritated, frequent crying, inability to concentrate, mood changes, nervousness and trouble falling asleep. (R. at 518.) Taylor's blood pressure was 156/102. (R. at 519.) Dr. Dar diagnosed Taylor with dysthymia, generalized anxiety disorder, high blood pressure and acid reflux. (R. at 519.) She prescribed amitriptyline and buspirone. (R. at 519.)

Taylor returned to Family Care Center on October 26, 2015, for a follow-up appointment. (R. at 520-23.) A history of chronic back pain was noted of sudden onset and a severity of a 10 on a 10-point scale. (R. at 520.) Taylor described the pain as aching, burning, cramping, dull, sharp, shooting and tender, and he stated it was constant. (R. at 520.) This pain radiated into the right buttocks and leg above the knee and into the left leg above the knee. (R. at 520.) Aggravating factors included lifting, movement, walking, lying down, bending and prolonged sitting, among other things. (R. at 520.) Taylor reported no alleviating factors. (R. at 520.) He reported that his neuropathy in the lower back and legs was exacerbated and uncontrolled, even with good medication compliance. (R. at 520.) He rated its severity as a 10 on a 10-point scale, and he stated it was constant. (R. at 520.) He

reported moderate numbness, decreased sensation and weakness, with aggravating factors of stress, lack of sleep, exercise, rest, walking, prolonged sitting and movement, but no alleviating factors. (R. at 520.) On physical examination, Taylor was in no acute distress, but appeared chronically ill. (R. at 521.) He was alert and fully oriented and ambulated without difficulty. (R. at 521.) He had no deformities, clubbing, cyanosis or edema of the extremities, but both hips, knees, ankles and feet were moderately tender with decreased range of motion. (R. at 522.) His gait was within normal limits, and he had no focal deficits. (R. at 522.) Taylor's mood was depressed with a congruent affect, his intellectual functioning was appropriate, as were his thought content and perceptions, and his associations were congruent. (R. at 522.) Evidence of exaggerated pain behavior was noted. (R. at 522.) There was midline spinal tenderness, paralumbar tenderness, parathoracic tenderness and buttocks tenderness noted. (R. at 522.) Range of motion with extension, lateral bending and rotation was moderately decreased. (R. at 522.) Patellar deep tendon reflexes were diminished bilaterally, and ankle dorsiflexion strength and sensation, as well as great toe dorsiflexion strength and sensation, were moderately decreased. (R. at 522.) Deep tendon reflexes in the ankles were diminished bilaterally, and ankle plantar flexion strength and sensation were moderately decreased. (R. at 522.) Straight leg raise testing was positive, and Taylor had a moderately antalgic gait. (R. at 522.)

Taylor was diagnosed with uncontrolled and worsening chronic low back pain; worsening lumbar disc degeneration; worsening sciatica; uncontrolled chronic pain syndrome; osteoarthritis, not otherwise specified; polyarthropathy; and peripheral neuropathy. (R. at 522-23.) It was explained to Taylor that his symptoms and examination were most consistent with a benign musculoskeletal back injury. (R. at 523.) He was given a favorable prognosis. (R. at 523.) Physical therapy was recommended, but Taylor declined. (R. at 523.) He was advised to

continue his current medication regimen. (R. at 523.)

Although the ALJ could not consider the evaluation and physical assessment conducted by Dr. Srini M. Ammisetty, M.D., on January 6, 2011, as part of the redetermination of Taylor's claim, I will include it for clarification of the record only. In sum, Dr. Ammisetty concluded that Taylor could lift and carry items weighing up to 10 pounds occasionally and up to five pounds frequently. (R. at 528-31.) He found that Taylor could stand/walk for a total of two hours in an eight-hour workday, but for only 30 minutes without interruption, and that he could sit for four hours in an eight-hour workday, but for only 30 minutes without interruption. (R. at 528-29.) Dr. Ammisetty opined that Taylor could occasionally balance, stoop, crouch and kneel, but never climb or crawl. (R. at 529.) He found that he could constantly see, hear and speak, frequently handle and feel objects, but occasionally reach and push/pull. (R. at 530.) Dr. Ammisetty opined that Taylor could frequently work around temperature extremes, chemicals, dust, noise, fumes and humidity, but occasionally work around heights, moving machinery and vibration. (R. at 531.)

## III. Analysis

### A. Procedural Arguments

Taylor makes multiple procedural arguments regarding the redetermination procedure itself, in addition to his argument regarding the ALJ's substantive determination that he was not disabled and not entitled to DIB benefits. I will address these procedural arguments first before turning to Taylor's substantive arguments. Taylor argues that the redetermination procedure violates his constitutional right to due process. He also alleges that various statutorily created

procedural rights were violated, including violations of res judicata principles contained in the Social Security Act and violations of the Administrative Procedure Act, ("APA"). Lastly, Taylor argues that his redetermination proceeding violated the "immediacy" requirement contained in § 405(u). As the Commissioner notes in her brief, these all appear to be issues of first impression in this district. However, courts in the Eastern District of Kentucky,[8] the Southern District of West Virginia[9] and the Middle District of Florida[10] have addressed the issues raised by Taylor. I agree with the reasoning of these courts, and their analysis of the issues informs my findings here.

The Commissioner has moved for summary judgment on Taylor's claims attacking the redetermination process. With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A genuine dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477

---

[8] The court notes that there is a split in the Eastern District of Kentucky as to whether the redetermination process violates claimants' constitutional due process rights. In *Hicks v. Colvin*, 2016 WL 5944715 (E.D. Ky. Oct. 12, 2016), Judge Thapar granted the plaintiff's motion for summary judgment and denied the Commissioner's cross-motion in related cases on due process grounds. However, in *Carter v. Colvin*, 220 F. Supp. 3d 789 (E.D. Ky. 2016), and *Perkins v. Colvin*, 224 F. Supp. 3d 575 (E.D. Ky. 2016), Judge Reeves and Judge Hood, respectively, found that the redetermination procedure comported with due process. The issue is on appeal to the Sixth Circuit, but no decision has yet been issued. I find the reasoning employed by Judge Reeves and Judge Hood persuasive.

[9] *See Robertson v. Berryhill*, 2017 WL 1170873 (S.D. W.Va. Mar. 28, 2017).

[10] *See Smith v. Comm'r of Soc. Sec.*, 2017 WL 5256872 (M.D. Fla. Nov. 13, 2017).

U.S. at 248. In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky.*, 93 F.3d 230, 233 (6th Cir. 1996). When a motion for summary judgment is made and is properly supported by affidavits, depositions or answers to interrogatories, the nonmoving party may not rest on the mere allegations or denials of the pleadings. *See Oliver v. Va. Dep't of Corrs.*, 2010 WL 1417833, at *2 (W.D. Va. Apr. 6, 2010) (citing FED. R. CIV. P. 56(e)). Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. *See Anderson*, 477 U.S. at 256-57.

The relevant provision of the Social Security Act at issue in this case is found at 42 U.S.C. § 405(u), which states as follows:

> (1)(A) The Commissioner of Social Security shall immediately redetermine the entitlement of individuals to monthly insurance benefits under this subchapter if there is reason to believe that fraud or similar fault was involved in the application of the individual for such benefits. …
> (B) When redetermining the entitlement, or making an initial determination of entitlement, of an individual under this subchapter, the Commissioner of Social Security shall disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence.

42 U.S.C.A. § 405(u)(1)(A)-(B) (West 2011). In 42 U.S.C. § 1320a-8(l), Congress required the SSA's OIG to make this determination as to whether there is such a

reason to believe fraud or similar fault was involved in a claimant's application for benefits. That section states, in relevant part:

> "As soon as the [OIG] has reason to believe that fraud was involved in the application of an individual for monthly insurance benefits under subchapter II or for benefits under subchapter VIII or XVI, the [OIG] shall make available to the Commissioner … information identifying the individual. …"

42 U.S.C.A. § 1320a-8(l) (West 2012 & Supp. 2017).

### 1. Claim of Due Process Violation

Taylor argues that § 405(u) violates principles of due process because: (1) the Agency did not supply an evidentiary basis for the determination that fraud was involved in the reports of the doctors; (2) the Agency never actually found that fraud was involved in those doctors' reports; and (3) the Agency did not give him the opportunity in the administrative proceedings to challenge the finding of fraud as to Dr. Ammisetty's report. Thus, Taylor's argument relies on his inability to challenge the OIG's finding that there was reason to believe that fraud was involved in his application. For the reasons that follow, I find all of Taylor's due process arguments unpersuasive, and I will enter summary judgment in the Commissioner's favor on this claim.

Due process is not a fixed concept, but is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). In *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Supreme Court set out a three-part balancing test courts must use when evaluating procedural due process claims. This three-part test requires courts to balance the following factors: (1) the private interest that will be affected by the official action;

(2) the risk of erroneous deprivation of such interest through the procedure used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See Mathews*, 424 U.S. at 334-35; *Robertson*, 2017 WL 1170873, at *5-6; *Carter*, 220 F. Supp. 3d at 799; *Smith*, 2017 WL 5256872, at *6.

Disability benefits constitute a statutorily created property interest. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 60 (1999); *see also Mathews*, 424 U.S. at 332; *see also Majors v. Astrue*, 2008 WL 2783524, at *1 n.6 (W.D. Va. July 16, 2008). Thus, the continued receipt of such benefits is protected by the Due Process Clause. *See Mathews*, 424 U.S. at 332; *see also Majors v. Astrue*, 2008 WL 2783524, at *1 n. 6 (W.D. Va. July 16, 2008). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). As to the first *Mathews* factor, I find that Taylor's interest is substantial. Taylor has stated that he is receiving SSI benefits of only $191.31 per month, whereas he previously was receiving $1,778.90 in monthly DIB benefits. Despite Taylor's admission that his wife receives monthly benefits and a monthly pension payment, he claims that the reduction in his monthly benefits has left his family unable to pay their bills.

As to the second *Mathews* factor, the risk of erroneous deprivation, the court must examine the procedural protections that are in place as part of the redetermination process. During the redetermination process, the Agency examines all of the evidence considered at the time of the original award of benefits, except for the evidence related to the alleged fraud. Claimants, however, are entitled to submit new evidence that relates to the time period relevant to the original award.

In fact, claimants have two opportunities to submit such new evidence – once after the initial notification before the Appeals Council remands the case to an ALJ, and again if the case is remanded. Moreover, the Agency will assist beneficiaries in obtaining and developing such new evidence. This new evidence may then be substituted for the excluded evidence. Here, Taylor was notified of his right to submit additional evidence by the Agency in a Notice of Appeals Council Action, dated May 18, 2015. (R. at 153-56.) In this Notice, the Appeals Council advised Taylor of its intention to redetermine his eligibility for benefits based on the OIG's reason to believe that fraud was involved in his application for benefits. The Appeals Council further advised Taylor: "You may send us more evidence or a statement about the facts and the law in your case within 10 days of the date of this letter. … If you cannot obtain the information within 10 days, you will have additional time to submit evidence, as described below, to the [ALJ]." (R. at 155.) The Appeals Council advised Taylor that it would consider additional evidence that was new and material and related to his disability starting on or before February 2, 2011, the date of the ALJ's decision awarding benefits. (R. at 155.) Thereafter, Taylor requested, and was granted, additional time to submit such evidence or statements to the Appeals Council regarding his original benefits application. (R. at 159-61.) Taylor further was advised that, if the Appeals Council ultimately remanded his case to an ALJ for further review, he would have yet another opportunity to submit additional evidence or statements at that time. (R. at 160.)

On September 23, 2015, Taylor was advised that the Appeals Council had remanded his case to an ALJ for further action. (R. at 162-64.) Taylor was advised that the ALJ would "consider the issue(s) you raise, the evidence now in your file, and any additional evidence you provide." (R. at 163.) This letter also stated "[w]e can help you get evidence. If you need help, contact our office, your local Social

Security office, or your representative … immediately." (R. at 164.) A September 29, 2015, Notice Of Conference was sent to Taylor, which stated that a prehearing telephone conference was scheduled for October 16, 2015, to discuss, among other things, any evidence not yet submitted. (R. at 174-75.) A Notice Of Hearing, dated November 16, 2015, was sent to Taylor, advising him of a December 15, 2015, hearing date. (R. at 176-81.) As part of this Notice Of Hearing, Taylor was again advised that the ALJ would consider additional evidence that was new and material and related to his disability on or before February 2, 2011. (R. at 178.) Thus, Taylor was notified that he had more than one opportunity to provide additional evidence to substitute for Dr. Ammisetty's excluded report.

The greatest risk of erroneous deprivation, however, comes from the exclusion of certain evidence. As the *Carter* court found, the degree of this risk is linked entirely to the probative value of the excluded evidence. *See* 220 F. Supp. 3d at 802; *see also Smith*, 2017 WL 5256872, at *7 ("Dr. Huffnagle was not a treating physician and his opinion is not entitled to controlling weight or deference under the regulatory framework."). Here, Dr. Ammisetty was not Taylor's treating physician; thus, his opinions would not be entitled to great weight under the regulations. *See* 20 C.F.R. § 404.1527(c)(2) (2017). As the court in *Carter* noted, if ALJ Daugherty erroneously gave this evidence more weight than it deserved, then redetermination is likely to produce a different result regardless of whether that evidence is excluded. *See* 220 F. Supp. 3d at 802-03. Also, as noted by the court in *Carter*, it not only is alleged that ALJ Daugherty was giving improper weight to the opinions from these nontreating providers, including Dr. Ammisetty, but that he was not weighing the evidence at all. *See* 220 F. Supp. 3d at 803. All of this being said, because Dr. Ammisetty's reports were most likely entitled to little weight, as opposed to controlling weight, and because claimants, including Taylor, may substitute for the excluded evidence, I find that the risk of erroneous

deprivation is low based on the procedures employed during redetermination hearings.

Additionally, Taylor proposes, as a substitute safeguard, that a hearing be held to determine whether Dr. Ammisetty's report should have been excluded. The statute at issue, 42 U.S.C. § 405(u), requires the Agency to disregard any evidence that is believed to be fraudulent. Thus, such a proposed hearing would include a determination of whether there is actually a reason to believe the fraud existed. As noted in *Carter* and *Robertson*, such a hearing likely would require the government to show by a preponderance of the evidence that fraud existed, which a claimant would then have to rebut. *See* 220 F. Supp. 3d at 803; *see also* 2017 WL 1170873, at *9. It is undisputed that there was evidence sufficient for a criminal indictment as to Conn, ALJ Daugherty and Dr. Adkins. With a criminal indictment of three main players in a fraud conspiracy and an investigation including Dr. Ammisetty in that conspiracy, it seems unlikely that the Agency would fail to meet its burden. *See Robertson*, 2017 WL 1170873, at *9. Also, while Dr. Ammisetty was not the subject of a criminal indictment, Conn was indicted, and as part of his guilty plea, he agreed to a factual basis to support it, which included that he provided precompleted medical forms to medical professionals, including Dr. Ammisetty,[11] who signed them without modifying their disabling limitations, despite the claimant's actual limitations. On the other hand, I find it unlikely that Taylor could succeed in rebutting such a showing where many potential witnesses are under criminal indictment. Although Taylor may be able to call Dr. Ammisetty as a witness to testify as to the legitimacy of his medical report, Dr. Ammisetty's credibility would be challenged and recollection doubtful. *See Robertson*, 2017

---

[11] The criminal indictment does not identify Dr. Ammisetty by name. Instead, it references "Unindicted Co-Conspirator A" and "Unindicted Co-Conspirator B." Given the OIG's referral, directing the Agency to exclude certain medical evidence from Dr. Ammisetty, it stands to reason that he, in fact, is one of these unindicted co-conspirators.

WL 1170873, at *9. It is for these reasons that I find that added evidentiary hearings on the fraud would be of negligible value in preventing erroneous deprivation. *See Carter*, 220 F. Supp. 3d at 803; *see also Robertson*, 2017 WL 1170873, at *9. Under the circumstances of this case, with the only excluded evidence being from a consultative medical provider, I find that the added evidentiary hearing on fraud would add little or no value in preventing the erroneous deprivation of Taylor's benefits. *See Robertson*, 2017 WL 1170873, at *9.

Furthermore, as the *Carter* court stated, Taylor's core interest is in the retention of his benefits, not in avoiding the redetermination. *See* 220 F. Supp. 3d at 803. Although a successful rebuttal of the fraud allegation would seem to ensure continued receipt of benefits, the inability to rebut the allegation does not compromise Taylor's right to prove his eligibility for benefits. *See Carter*, 220 F. Supp. 3d at 803; *see also Robertson*, 2017 WL 1170873, at *9 (noting that the final decision that the plaintiff did not qualify for disability benefits did not turn on the fraud determination, but on the sufficiency of the evidence, and the plaintiff was given a full opportunity, with assistance from SSA, to develop new evidence to prove his disability.) Therefore, when it comes to the actual probative value of a fraud hearing on Taylor's ability to retain his DIB benefits, it will be relatively meaningless at this stage. *See Carter*, 220 F. Supp. 3d at 803; *see also Robertson*, 2017 WL 1170873, at *9 ("[T]he added evidentiary hearing of fraud would add little to no value in preventing the erroneous deprivation of Plaintiff's benefits."). For all of the above-stated reasons, I find that the second *Mathews* factor tips in favor of the defendant.

I will next turn to the third *Mathews* factor – the government's interest. This includes the function involved and the financial and administrative burdens the

additional or substitute safeguards would entail. Other circuit courts have emphasized that, in "[m]easuring the important interests at stake, as described in both *Goldberg v. Kelly*[12] and in *Mathews v. Eldridge*" an individual's interest in the finality of the decision as to whether he is eligible for benefits does not outweigh the government's "interest in assuring a fiscally responsible system which is subject to proper auditing." *Himmler v. Califano*, 611 F.2d 137, 146-47 (6th Cir. 1979); *see also Ching v. Mayorkas*, 725 F.3d 1149, 1158 (9th Cir. 2013) (the degree of defendant's interest in preventing fraud and in avoiding erroneously providing benefits is relevant to the third factor in the *Mathews* test); *see also Smith*, 2017 WL 5256872, at *7 (finding that the government's interest is "legitimate and compelling."). First, I find that such additional procedures would seem to undermine the swift termination of benefits that is the purpose of the redetermination process. In this case, if the nearly 1,800 individuals whose entitlement had to be redetermined were granted "mini trials" as to whether there was a reason to believe that fraud was involved in their individual cases, the costs would be high, overpayments would mount, the criminal proceedings could be jeopardized, the chance of disparate results would be significant and the Agency's strong interest in complying with its statutory mandate to conduct redeterminations "immediately" would be undermined. *See Robertson*, 2017 WL 1170873, at *10 ("The greatest detriment to the SSA in requiring these evidentiary hearings would be the time and delay involved."); *see also Erickson v. U.S. ex rel. Dep't of Health & Human Servs.*, 67 F.3d 858, 863 (9th Cir. 1995) ("Requiring full-blown predeprivation hearings would frustrate Congress' intent and impede the Secretary's ability to act quickly. It would also impose significant administrative costs."). This is not to say that these burdens would necessarily outweigh the interest in avoiding the risk of erroneous deprivation of benefits. However, in

---

[12] *Goldberg v. Kelly*, 397 U.S. 254 (1970).

reality, and as stated above, such hearings would likely be of minimal value to a claimant's ability to retain benefits.

Part of the fraud allegation is that physicians, including Dr. Ammisetty, were signing precompleted residual functional capacity forms, which included disabling limitations, regardless of a claimant's actual limitations. While the Agency does not want to continue to pay benefits to claimants who are not entitled to them, it also does not wish to deprive deserving claimants of benefits to which they are entitled. Thus, Congress struck a balance by requiring that the fraudulent evidence be excluded from the redetermination procedure, and the Agency developed processes through which claimants may submit new evidence to substitute for the excluded evidence. *See Carter*, 220 F. Supp. 3d at 804. The Agency also offers its assistance to claimants in doing so. Furthermore, in this case, because the United States has undertaken criminal prosecutions where warranted, to require a judicial-type hearing as to the existence of fraud in this administrative context would frustrate the redetermination process. *See Carter*, 220 F. Supp. 3d at 804. Moreover, requiring the Commissioner to obtain the relevant evidence from the OIG and present it to each individual defendant in the administrative context also could risk compromising the ongoing criminal prosecutions. *See Carter*, 220 F. Supp. 3d at 804. As the court in *Carter* found, because there is a strong public interest in maintaining the integrity of the criminal prosecution, and not needlessly tying up the process of redetermining benefits, I also find that this third *Mathews* factor weighs in favor of the government. *See* 220 F. Supp. 3d at 804.

Additionally, I find that being subject to a redetermination without a threshold adjudication of the fraud allegation does not violate due process for the following reasons. Beneficiaries are subject to routine reevaluations. The regulations provide limitations as to when the Commissioner may reopen benefits

determinations, with a general limit of four years absent any of the stated conditions. *See* 20 C.F.R. § 404.988(b) (2017). Additionally, Congress is free to mandate more frequent reviews of Title II or Title XVI benefits without violating the due process rights of beneficiaries. Thus, while beneficiaries have a property interest in their previously awarded benefits, they do not have a constitutional interest in not being subjected to continuing assessments of eligibility. *See Carter*, 220 F. Supp. 3d at 805.

Furthermore, it would be fundamentally unfair, and defeat the primary purpose of procedural due process, if similarly situated individuals received disparate decisions based on different factfinders' analyses of the evidence against Conn, Daugherty and the medical sources. By bestowing the OIG with exclusive authority to conduct investigations into large-scale fraud schemes perpetrated by third parties, requiring OIG to notify the Agency of any "reason to believe" findings resulting from its investigations and requiring the Agency to initiate redeterminations based on those findings, the redetermination process as prescribed by Congress ensures that its programs are administered fairly and uniformly. Moreover, requiring the Agency to factually determine fraud in each case would thwart the OIG's exercise of authority granted to it by Congress to identify and prosecute program fraud. *See Robertson*, 2017 WL 1170873, at *5.

In sum, I find that, even though Taylor has a substantial interest in the retention of his DIB benefits, the risk of erroneous deprivation is not sufficient to justify the substitute safeguards he seeks. Also, the additional process he seeks could substantially interfere with other important interests. I find that, because the fraud allegation is not the proximate cause of Taylor's benefits being terminated, and because he was given a meaningful opportunity to substitute for Dr. Ammisetty's evidence, he has not been deprived of due process. Because there is

no genuine dispute as to a material fact regarding Taylor's due process claim, and because I am persuaded by the Commissioner's legal arguments as set out above, I will grant summary judgment in the Commissioner's favor on Taylor's claim in Count I.

### 2. Claim of Violations of the Social Security Act and/or Agency Regulations
#### a. Res Judicata

Taylor argues that the doctrine of res judicata precludes the Agency from revisiting the previous decision granting him DIB benefits. Again, I find this argument unpersuasive. "Under the doctrine of res judicata, … '[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)). The Fourth Circuit has held that 42 U.S.C. § 405(h) codifies res judicata and prevents final decisions by the Agency from being relitigated. *See Lively v. Sec'y of Health & Human Servs.*, 820 F.2d 1391, 1392 (4th Cir. 1987); 42 U.S.C.A. § 405(h) ("The findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided.") Applying res judicata to social security cases prevents the Agency "from reaching an inconsistent result in a second proceeding based on evidence that has already been weighed in a claimant's favor in an earlier proceeding." *Lively*, 820 F.2d at 1392; *see also United States v. Utah Const. & Min. Co.*, 384 U.S. 394, 422 (1966). However, Congress can override common law principles of res judicata by crafting legislation with alternate procedures. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("Thus,

where a common-law principle is well established … the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident.") (internal quotation marks and citations omitted); *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 478 n.10 (4th Cir. 1999) (recognizing authority for SSA to reopen previous final decisions under certain circumstances).

As the *Robertson* court stated, the principles of res judicata prevent the Agency from revising decisions based on the same evidence, absent an exception provided by the Act. Because the redetermination process excludes evidence believed to contain fraud, the file is no longer the same as it was at the time of the original determination. *See Robertson*, 2017 WL 1170873, at *15. As stated herein, claimants in redetermination proceedings are allowed to supplement their files with new medical and other evidence, which the ALJ reviews as a whole when redetermining benefits. Here, the ALJ did not consider precisely the same evidence during the redetermination because Dr. Ammisetty's reports were excluded from such consideration. This difference makes the new ALJ's redetermination different than merely revising an ALJ's decision based on the same information. *See Robertson*, 2017 WL 1170873, at *15 n.17. That being the case, I find Taylor's res judicata argument unpersuasive.

I also find that 42 U.S.C. § 405(u) overrides common law res judicata principles. Title 42 U.S.C. § 405(h) limits reviewing final determinations by the Agency unless specifically provided for in the statute. Section 405(u) explicitly authorizes the SSA to redetermine claimants' benefits after receipt of an OIG referral based on a reason to believe fraud was involved in the claimant's application for benefits. Therefore, the statutory scheme provides a mandate that overrides principles of res judicata. *See Robertson*, 2017 WL 1170873, at *15. As

the *Robertson* court found, "Congress would not have created a redetermination process that could be displaced by common law res judicata principles as it would make § 405(u) meaningless." 2017 WL 1170873, at *15. Furthermore, § 405(h) allows for certain exceptions to reviewing final determinations, one of which is the redetermination process. *See Robertson*, 2017 WL 1170873, at *15. Therefore, I find that the redetermination process fits within the statutory scheme that protects res judicata concerns while, at the same time, allowing for revisions when the Agency discovers changed circumstances. That being the case, I find Taylor's res judicata argument unpersuasive.

### b. Section 405(b)

Taylor argues that the redetermination process runs counter to the Act's requirements regarding procedural protections in § 405(b). I am not persuaded by Taylor's argument because, as the Commissioner argues, § 405(b) simply does not apply to redeterminations. As the *Robertson* court noted, in deciding whether the redetermination process falls under the procedural protections contained in § 405(b), the court must engage in an exercise of statutory construction. *See* 2017 WL 1170873, at *12. Section 405(b) states "[a]ny … decision *by the Commissioner* of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain" various procedural protections, including the right to a hearing on the evidence relied upon. 42 U.S.C.A. § 405(b) (West 2011 & Supp. 2017) (emphasis added). In this case, the Commissioner did not make the decision that there was reason to believe fraud was involved in Taylor's application; the OIG did pursuant to its authority in § 1129(l) of the Act. *See* 42 U.S.C.A. § 1320a-8(1). The Commissioner has no role in the OIG's determination of fraud under § 405(u). *See Robertson*, 2017 WL 1170873, at *12; 42 U.S.C.A. § 405(u). Instead, the OIG's referral is made after a

separate investigation. The OIG's referral merely triggers the redetermination process and mandates the exclusion of tainted evidence. *See Robertson*, 2017 WL 1170873, at *12. The *Robertson* court found that "[r]eading the statute's plain language, … the SSA has complied with the Act's requirements. The redeterminations, as currently structured, provide hearings with the opportunity for new evidence, evidentiary challenges to the information remaining in the file, witnesses, and written decisions analyzing the evidence and arguments presented at the hearing." *Robertson*, 2017 WL 1170873, at *12. While § 405(u) does not require such hearings, the Agency has properly provided claimants facing potential adverse decisions hearings on the evidence, as required by § 405(b).

### c. *Reopening Regulations*

Taylor argues that the redeterminations should follow reopening procedures, found at 20 C.F.R. § 404.987 et seq., which require a finding of fraud by the Commissioner before benefits may be revised. I am not persuaded by this argument because the reopening regulations are not applicable to redeterminations conducted pursuant to § 405(u). The *Carter*, *Robertson* and *Smith* courts all found this same argument unconvincing, recognizing the distinction between reopenings and redeterminations. In *Robertson*, the court noted that "[r]eopenings require *the SSA* to make a finding of fraud or similar fault before reopening and revising a claimant's benefits." 2017 WL 1170873, at *13 (citing 20 C.F.R. § 404.988). Thus, if a claim for benefits is reopened under these regulations, a claimant would be able to challenge the Agency's determination of fraud as part of the Commissioner's final decision. *See Robertson*, 2017 WL 1170873, at *13. However, as stated above, redeterminations triggered by OIG investigations, provide for an independent fraud determination that occurs separate from the Agency. *See Robertson*, 2017 WL 1170873, at *13. The OIG referral is based on

reason to believe fraud existed, but that determination is not made by the Commissioner and does not affect the Commissioner's final decision to award or terminate a claimant's benefits on redetermination. *See Robertson*, 2017 WL 1170873, at *13. Thus, the *Robertson* court found that the Agency's interpretation that reopenings exist separately from redeterminations follows the different structure provided in the Act itself. *See* 2017 WL 1170873, at *13. Specifically, in *Robertson v. Colvin*, 2016 WL 3406134, at *2 (S.D. W. Va. June 17, 2016),[13] the court noted that "Congress labeled this authority [42 U.S.C. § 405(u)] a 'redetermination;' therefore, Defendant need not act under the authority required to 'reopen' a claim." The court further noted that when Congress uses different language to describe a new process, the court will consider that differentiation important and deliberate. *See Robertson*, 2017 WL 1170873, at *13 (citing *Bd. of Educ. of Westside Cmty. Sch. v. Mergens by & through Mergens*, 496 U.S. 226, 242 (1990) ("Congress' deliberate choice to use a different term … can only mean that it intended to establish a standard different from the one [previously] established.")). Likewise, in *Carter* and *Smith*, the courts held that redeterminations are distinct from reopenings, and the Agency's interpretation of the statute is entitled to deference. *See* 220 F. Supp. 3d at 807; *see also* 2017 WL 5256872, at *4. According to Social Security Ruling, ("S.S.R."), 16-1p, "[f]raud and similar fault redeterminations under sections 205(u) and 1631(e)(7) of the Act are distinct from reopenings as described in 20 C.F.R. [§§] 404.987-404.996. …" S.S.R. 16-1p, 2016 WL 1029284, at *1 n.1 (West Mar. 14, 2016). Section (D)(3) of the same ruling states as follows: "An individual may appeal our finding of fraud or similar fault. However, we will not administratively review information provided by SSA's [OIG] under section 1129(l) of the Act regarding its reason to believe that fraud was involved in the individual's application for benefits." S.S.R.

---

[13] This was a decision as to the plaintiff's motion for a preliminary injunction.

16-1p(D)(3), 2016 WL 1029284, at *5. While Social Security Rulings do not have the force or effect of law, they are entitled to *Chevron*[14] deference, insofar as they directly involve construction of the statute at issue. *See Garcia v. Sec'y of Health & Human Servs.*, 46 F.3d 552, 557 (6th Cir. 1995); *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (an agency's rulings, interpretations and opinions under its statute are entitled to deference).

In addition to Social Security Rulings, the conclusion that redeterminations are distinct from reopenings also is apparent from the Agency's promulgation of distinct guidelines for the process found in HALLEX. Specifically, HALLEX I-1-3-25(C)(4)(a) states as follows:

> Under sections 205(u) and 1631(e)(7) of the Act, adjudicators do not have discretion to reconsider the issue of whether the identified evidence should be disregarded when based on an OIG referral of information or a referral based on information obtained during a criminal or other law enforcement investigation. However, when the redetermination is based solely on an SSA finding of fraud or similar fault, an adjudicator can consider a beneficiary's or recipient's objection to the disregarding of certain evidence.

Because the Act is silent on hearings, it stands to reason that Congress did not

---

[14] *Chevron* deference refers to the doctrine of judicial deference given to administrative actions. In *Chevron U.S.A., Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837 (1984), the Supreme Court set out a legal test regarding when the court should defer to an agency's statutory interpretation. The Court held that such judicial deference is appropriate where the agency's interpretation is not unreasonable, as long as Congress has not spoken directly to the precise issue in question. *See Chevron*, 467 U.S. at 845. When a legislative delegation to an administrative agency on a particular issue or question is implicit, as opposed to explicit, a court may not substitute its own interpretation of the statute for a reasonable interpretation made by the administrative agency. *See Chevron*, 467 U.S. at 845. When the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's action was based on a permissible construction of the statute. *See Chevron*, 467 U.S. at 843. "Permissible" has been defined to mean "reasonable." *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124 (2016).

envision hearings on the threshold question of fraud, and the Agency's interpretation is reasonable and entitled to deference. Congress's intention that there be a distinction between redeterminations and reopenings also is supported by the legislative history, which shows that Congress enacted § 405(u) because it believed the reopening rules were "cumbersome and unworkable" in addressing cases of fraud in applications for benefits. *Carter*, 220 F. Supp. 3d at 807.

### d. Timeliness

Taylor also argues that the Agency violated the mandate contained in §405(u) to "immediately" commence redetermination proceedings once it had notice of fraud. For the reasons that follow, I find this argument unpersuasive. Section 405(u) provides that the Commissioner is to act immediately to redetermine benefits where there is reason to believe that fraud was involved in a claimant's application. However, the statute contemplates that the Agency may delay taking adverse action if it would jeopardize a criminal prosecution. *See* 42 U.S.C.A. § 405(u)(1)(A); *see also Smith*, 2017 WL 5256872, at *8. In this case, on May 12, 2015, the Agency received a referral from the OIG pursuant to § 1129(l) of the Act, found at 42 U.S.C. § 1320a-8(1), informing the Agency that it had reason to believe that fraud had been involved in 1,787 individuals' benefits applications, including Taylor's. Less than a week later, on May 18, 2015, SSA notified individuals, including Taylor, that a redetermination of their benefits would be initiated. Although Taylor points to an earlier letter from OIG, dated July 2, 2014, regarding the probable fraud, he admits that letter stated that "SSA would not take any adverse action against any individual on the list until further notice." Thus, I find that this correspondence cannot be deemed a referral from the OIG. That being the case, I find that the Agency, pursuant to the statute, waited to notify individuals that their benefits would not be redetermined until after it received an

actual referral from the OIG, on May 12, 2015, permitting it to undertake such action. *See* 42 U.S.C.A. §§ 405(u)(1)(A), 1320a-8(1).

As the court noted in *Carter*, while the Commissioner may have had reason to believe that widespread fraud was taking place years earlier, the statutory mandate for such fraud investigations is vested in the OIG. [insert cite] Specifically, 42 U.S.C. § 1320a-8(1) provides that the OIG is to make information available to the Commissioner immediately when there is reason to believe fraud has occurred, but it provides that the OIG may delay if such a referral would interfere with a pending criminal investigation. *See* 42 U.S.C.A. § 1320a-8(l). This is precisely what the OIG did here. OIG notified the Agency, by letter, once it determined there was reason to believe that fraud had occurred, but it also advised the Agency not to undertake any action until further notice. Because triggering redetermination proceedings for approximately 1,800 individuals may have interfered with criminal proceedings, I find that any delay in the referral period was justified. As the court in *Carter* noted, investigating and substantiating claims of fraud takes time, especially where internal misconduct and alleged cover-ups were involved. *See* 220 F. Supp. 3d at 808. Also in *Carter*, the court found that, while a "more expeditious process" would have benefitted all parties involved, including the public fisc, the delay was "part-and-parcel to the fraud on which the redeterminations are based." 220 F. Supp. 3d at 808. As the court stated in *Smith*, although the record does not contain a certification from a prosecutor, as contemplated by the statute, the language of the referral, the history of the investigation as set forth in related cases, and the fact that Conn, ALJ Daugherty and Dr. Adkins were indicted on April 1, 2016, make clear that a criminal investigation was underway or at least contemplated when the July 2014 initial letter was sent. *See Smith*, 2017 WL 5256872, at *8.

Also, Taylor has failed to show that the time lapse actually amounts to a violation of the statute or that a remedy exists therefor. *See Carter*, 220 F. Supp. 3d at 809 (citing *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 23-24 (1979) (to determine whether a private remedy exists in a statute "the central inquiry [is] whether Congress intended to create, either expressly or by implication, a private cause of action.")); *see also Smith*, 2017 WL 5256872, at *9. As the *Robertson* court stated, the statute does not contain language regarding the consequences to the Agency if it fails to act with immediacy. *See* 2017 WL 1170873, at *10; *see also Smith*, 2017 WL 5256872, at *9. Thus, as the *Robertson* court found, even if the Agency could have acted sooner, when the investigation began, this court will not penalize the Agency by barring the redetermination process when such a penalty is not provided for within the Act. *See* 2017 WL 1170873, at *11. Also, the fact that the Agency, itself, is allowed to reopen a disability determination at any time for fraud or similar fault supports the idea that the immediacy requirement was created to protect the public fisc rather than to provide a claimant with a speedy redetermination. *See Robertson*, 2017 WL 1170873, at *10 (citing 20 C.F.R. § 404.988(c) (allowing reopening for claims obtained by fraud at any time)); *see also Smith*, 2017 WL 5256872, at *9.

For all of these reasons, I find there is no genuine dispute of material fact, and I will enter summary judgment in the Commissioner's favor on Taylor's claims contained in Counts III, V and VI.

### 3. *Claims of Violations of the APA*

Taylor next argues that the redetermination hearings are subject to the APA's procedural and substantive protections against actions undertaken by government agencies. *See* 5 U.S.C.A. §§ 551 *et seq*. (West 2017). First, Taylor

argues that the redetermination hearings violate the strict rule against mixing investigatory and adjudicative functions. Secondly, Taylor contends that the redetermination hearings violate the evidentiary rules for formal adjudications. Lastly, Taylor argues the Commissioner's decision was arbitrary and capricious, in violation of the APA. I am not persuaded by any of these arguments. The APA's formal hearing requirements are limited to adjudications "required by statute to be determined on the record after opportunity for an agency hearing." 5 U.S.C.A. § 554(a) (West 2017); *see also Doolin Sec. Sav. Bank, F.S.B. v. F.D.I.C.*, 53 F.3d 1395, 1402 (4th Cir. 1995) ("The APA creates no greater rights to a formal hearing, where, as here, the statute and regulations do not provide a hearing on the record"). Nothing in § 405(u) requires the Agency to provide a formal hearing on the record on the issue of fraud, and, thus, the APA's formal adjudication requirements do not apply. *See Carter*, 220 F. Supp. 3d at 810 (rejecting argument that the APA formal adjudication requirements apply to § 405(u)); *Perkins*, 224 F. Supp. 3d at 579 (same). Although § 405(u) does not require any hearing, as previously explained, Taylor was provided with a number of procedural protections, including a hearing before an ALJ and the opportunity to provide evidence during that hearing to establish that he was entitled to benefits at the time of the application.

Taylor argues that, because under § 405(u), the ALJ had to accept the OIG's fraud allegation as determinative of the fraud issue, the redetermination process violates the APA's rule that the ALJ may not be directed by the Agency's investigative or prosecutorial functions. *See* 5 U.S.C.A. § 554(d) (West 2017) ("[An ALJ] may not be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency. An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision,

or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings."). Taylor argues that 5 U.S.C. § 554(d) mandates an "absolute firewall" be maintained between investigators and adjudicators performing their respective functions within the Agency. I find Taylor's argument misplaced. A fraud determination made by the OIG under § 405(u) merely triggers the initiation of the redetermination process. The ALJs, then, make an independent decision under the Act as to whether the record evidence, minus the allegedly fraudulent evidence, supports an entitlement to disability benefits. *See* 42 U.S.C.A. § 405(u)(3) (West 2011 & Supp. 2017). The OIG does not play any role in the determination of whether a claimant is entitled to benefits.

Taylor also argues that redetermination hearings violate the evidentiary rules requiring formal adjudications under the APA. I disagree. Taylor argues that the APA requires that the administrative transcript testimony and exhibits, together with all papers and requests filed in the proceeding, "constitutes the exclusive record for decision." 5 U.S.C.A. § 556(e) (West 2017). Taylor argues that, because there is nothing in his administrative record setting forth the evidence used by the OIG to find fraud and trigger the redetermination, he could not show to the contrary. Because, as explained above, the Agency's decision that Taylor was not entitled to disability benefits did not rest on the OIG's fraud determination, I find Taylor's argument to be without merit.

Lastly, Taylor argues that the Commissioner's decision is arbitrary and capricious, in violation of the APA. Specifically, he argues that the Agency has created an arbitrary policy by adopting a bifurcated scheme for when beneficiaries can challenge the fraud allegations. He explains that, under the HALLEX, if allegations of fraud arise from someone inside the Agency who is not within the OIG division, then he would be given the opportunity to challenge the allegations,

as well as a right to appeal. *See* HALLEX § I-1-3-25(C)(4)(a). However, when the allegation of fraud comes from the OIG, the "adjudicators do not have discretion to reconsider" OIG's allegation. Taylor argues that the creation of such a dichotomy in how claims are treated is not only arbitrary and capricious, but also not rooted in any law. *See* 5 U.S.C.A. § 706(2) (West 2017). I find that this argument is without merit. For the reasons explained above, and as stated in the Commissioner's brief, I find that Congress intended a different process for redeterminations, and the Agency's interpretation of the statute is entitled to deference.

For all of the foregoing reasons, I find there is no genuine dispute of material fact and I will enter summary judgment in the Commissioner's favor on Taylor's claims contained in Counts II, IV and VII.

## B. Substantive Arguments

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2017); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2017).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its

judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Substantively, Taylor argues that the ALJ's decision is not supported by substantial evidence. (Motion For Summary Judgment, ("Plaintiff's Brief"), at 13-14, 42-43.) In particular, Taylor argues that the ALJ erred by giving more weight to the opinions of the state agency consultants, whose findings were factually incorrect because they found that he had no complaints of back pain during his only medical visit in July 2010. (Plaintiff's Brief at 13, 42.) Taylor further argues that the ALJ failed to properly develop and analyze the medical evidence. (Plaintiff's Brief at 13, 39-42.) Taylor also alleges that the ALJ failed to properly consider the impact of his post-2011 evidence to the pre-2011 period. (Plaintiff's Brief at 13, 41-42.) Taylor contends that the ALJ should have obtained a medical source statement to determine whether his 2013 diagnosis of degenerative disc disease would have had an onset in 2010 or should have, at the very least, sent the post-2011 medical records to the state agency physicians for consideration. (Plaintiff's Brief at 13, 41.)

Taylor first argues that the ALJ failed to develop the record based on the 2013 radiological evidence showing degenerative disc disease. More specifically, he argues that the ALJ should have obtained a medical source statement from his primary care providers at Family Care Center and the radiologist who read the x-ray as to whether this degenerative disc disease would have existed before February 2011, or he should have, at the very least, sent the post-2011 medical

records to the state agency physicians for review. For the reasons that follow, I find this argument unpersuasive.

It is well-settled that the ALJ does have a duty to help develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). Specifically, "… the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Cook*, 783 F.2d at 1173. However, the regulations require only that the medical evidence be "complete" enough to make a determination regarding the nature and effect of the claimed disability, the duration of the disability and the claimant's residual functional capacity. *See* 20 C.F.R. § 404.1513(e) (2017). "[T]he ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." *Zook v. Comm'r of Soc. Sec.*, 2010 WL 1039456, at *4 (E.D. Va. Feb. 25, 2010) (quoting *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994)). While the ALJ bears some responsibility for development of the record, the ALJ "has the right to assume that counsel is presenting the claimant's strongest case for benefits." *Epperly v. Colvin*, 2015 WL 5138373, at *5 (W.D. Va. Aug. 31, 2015) (quoting *Blankenship v. Astrue*, 2012 WL 259952, at *13 (S.D. W.Va. Jan. 27, 2012)). The Fourth Circuit has held that, in order for a case to be remanded for failure to develop the record, two requirements must be met: (1) the ALJ failed to fully inquire into the issues necessary for adequate development of the record; and (2) such a failure is prejudicial to the claimant. *See Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980). Thus, courts must determine "whether the record is adequate to support a judicious administrative decision[,]" which centers on whether there are "evidentiary gaps" that prejudice the rights of the claimant. *Epperly*, 2015 WL 5138373, at *5 (quoting *Blankenship*, 2012 WL 259952, at *13 (citing *Marsh*, 632 F.2d at 300).

Here, I find that the ALJ did not fail to fully inquire into the issues necessary for adequate development of the record. In his decision, with regard to Taylor's back impairment, the ALJ did find that Taylor's excellent earnings record prior to June 2010 tended to support his allegation that he could not work due to pain after this date. (R. at 14.) However, the ALJ further found that this was only one factor he considered and that this factor was outweighed by other factors. (R. at 14.) Specifically, the ALJ found that Taylor's subjective allegations were not consistent with the objective evidence during the relevant time period. (R. at 14.) This objective evidence included physical examinations showing that Taylor could stand and that he had a steady gait. (R. at 15.) Furthermore, despite Taylor's allegations of disabling back pain, he exhibited a full range of motion in his extremities. (R. at 15.) An August 2010 physical examination also was unremarkable with regard to Taylor's complaints of back pain. (R. at 15.) While the ALJ noted the 2013 x-ray reflected lumbar degenerative disc disease, he further noted that this was well after the relevant time period. (R. at 15.) The ALJ found that, despite Taylor's complaints of back pain, there was no evidence of treatment, imaging, diagnoses or clinical deficits during the relevant time period to support the extent of his allegations. (R. at 15.) The ALJ concluded that Taylor's lack of treatment showed that his back impairment was not imposing more than minimal vocational limitations during the relevant period. (R. at 15.)

It is clear from the ALJ's decision that he thoroughly reviewed the evidence before him as it related to the time period relevant to the redetermination of Taylor's award of benefits. I find that there are no "evidentiary gaps" in the record. Instead, I find that there simply is a lack of evidence to support his allegations of disabling back pain. As stated by the ALJ in his decision, the record shows that, during the relevant time period, Taylor's physical examinations were largely unremarkable, showing that he could stand erect with a steady gait. (R. at 357, 372,

442.) Even after the relevant time period, however, Taylor's physical examinations remained largely benign. For instance, in March 2011, he could walk with a steady gait, and he had no complaints of leg or muscle pain. (R. at 437.) In May 2011, Taylor had a full range of motion of the extremities and normal reflexes. (R. at 436.) In October 2011, February 2012, and July 2012, Taylor's spine and gait were normal. (R. at 433-35.) In May 2013, despite complaints of lower back pain with a burning sensation radiating into both legs and feet, he had a full range of motion of the extremities, normal reflexes and a steady gait. (R. at 432.) X-rays taken in June 2013, showed levoscoliosis with degenerative disc and joint disease. (R. at 451.) Nonetheless, in July 2013, Taylor had a full range of motion of the extremities and a steady gait. (R. at 431.) He did exhibit paraspinal muscle tenderness and pain and burning which radiated into the bilateral lower extremities. (R. at 431.) He received Ultram. (R. at 431.) In August 2013, Taylor again had a full range of motion in his extremities, and no gross neurological deficits were noted. (R. at 430.) In November 2013, Taylor was noted to be limping. (R. at 429.) In February 2014, he had full range of motion of the extremities, reflexes were normal, and no neurological deficits were noted. (R. at 427.) In March 2014, a physical examination yielded normal findings. (R. at 423.) In November 2014, Taylor again had a full range of motion of the extremities and normal reflexes. (R. at 422.) In February 2015, no deformities or muscle wasting were noted, Taylor had a normal gait and ambulated without difficulty, he had no joint dislocation, instability or subluxations, and he had full muscle strength and a normal range of motion without crepitus. (R. at 392, 410.) In March 2015, despite Taylor's complaints of chronic bilateral extremity burning, tingling and numbness, a physical examination was within normal limits. (R. at 419.) Also in March 2015, a physical examination was largely normal, except for crepitation of both knees and trace pitting edema of both lower extremities. (R. at 486.) A chest x-ray, dated March 12, 2015, showed mild age-indeterminate wedge deformity of the L1 disc. (R. at 417, 480.) In April

2015, a physical examination was normal, except for mildly reduced range of motion of the right elbow and crepitation of both knees. (R. at 494.) In August 2015, Taylor had a full range of motion of the extremities, and he exhibited normal reflexes. (R. at 500.) In September 2015, he had positive bilateral straight leg raise testing. (R. at 501.) In October 2015, Taylor had paraspinal muscle tenderness. (R. at 502-03.) On October 26, 2015, despite Taylor's complaints of back pain, which he rated a 10 on a 10-point scale, he ambulated without difficulty, his gait was within normal limits, and he had no focal deficits. (R. at 520-22.) There was midline spinal tenderness, paralumbar tenderness, parathoracic tenderness and buttocks tenderness, and range of motion was moderately decreased. (R. at 522.) Straight leg raise testing was positive, and Taylor had a moderately antalgic gait. (R. at 522.) However, Taylor was advised that his symptoms and examination were most consistent with a benign musculoskeletal back injury, and he was given a favorable prognosis. (R. at 523.) He declined a recommendation for physical therapy. (R. at 523.)

Thus, even the medical evidence supplied by Taylor that is not relevant to the time period for determining disability, contained mostly unremarkable or benign clinical findings. He was treated conservatively over this time period, and he declined a recommendation to undergo physical therapy. It is well-settled that a diagnosis, alone, cannot constitute a basis for finding that a claimant is disabled. *See Musser v. Berryhill*, 2017 WL 4399202, at *7 (W.D. Va. Sept. 29, 2017) (citing 20 C.F.R. § 404.1505 (defining disability)). Instead, the diagnosis must result in work-preclusive limitations. Here, despite 2013 x-rays reflecting that Taylor suffered from levoscoliosis with degenerative disc and joint disease, the record does not support a finding that such condition resulted in disabling limitations.

To the extent that Taylor is arguing that the ALJ should have ordered a consultative examination, I also am not persuaded. Title 20 C.F.R. § 404.1512(f) provides that a consultative examination is required when the needed information is not readily available from the records the claimant's medical treatment source, or the Commissioner is unable to seek clarification from the claimant's medical source. 20 C.F.R. § 404.1512(b)(2) (2017). A consultative examination also is required when the record evidence, as a whole, is insufficient to support a decision or when "[t]here is an indication of a change in [the claimant's] condition that is likely to affect [the claimant's] ability to work, but the current severity of [the claimant's] impairment is not established." 20 C.F.R. § 404.1519a(b)(4) (2017). Importantly, "the decision to order a consultative examination is committed to the discretion of the ALJ, and where the record as a whole provides sufficient, unambiguous, and non-conflicting evidence to support the ALJ's decision, a consultative examination is not required." *Keplinger v. Astrue*, 2008 WL 4790663, at *5 (W.D. Va. Nov. 3, 2008). For all of the reasons stated above, I find that the record was complete enough for the ALJ to make an informed decision that Taylor was not disabled during the relevant time period. I also note that neither Taylor nor his counsel requested that the ALJ obtain such a consultative examination. Finally, I find that the evidence of record generally is in agreement and, thus, the ALJ did not have any conflicts to resolve that would be served by a consultative examination. For all of these reasons, I find that the ALJ's decision was based on an adequately developed record, and the ALJ was within his discretion in not ordering a consultative examination.

Taylor also argues that the ALJ erred by giving great weight to the opinions of the state agency physicians. In particular, he contends that the ALJ so erred because the state agency physicians' opinions rest on their incorrect finding that, at his only medical visit in July 2010, Taylor did not complain of back pain.

(Plaintiff's Brief at 42.) Thus, the state agency physicians concluded that his complaints of pain in his back and extremities could not be the result of a medical determinable impairment. To the contrary, Taylor alleges that this July 2010 treatment note indicates that he had a history of chronic back pain, and it reflected his statement that he was quitting his job because he could not tolerate his back pain. (Plaintiff's Brief at 42.) For the reasons that follow, I find that the ALJ's weighing of the evidence is supported by substantial evidence.

A review of the July 13, 2010, treatment note from Family Care Center shows that Taylor's chief complaint was increased blood pressure. (R. at 357.) He did not actively complain of back pain on that date. This note also reflects that Taylor stood erect and had a steady gait, and no gross neurological deficits were noted. (R. at 357.) A history of chronic back pain was noted, as well as Taylor's statement that he was quitting work because he could not tolerate the pain in his back. (R. at 357.) However, no diagnosis related to Taylor's back pain was rendered on that date, and no medications were prescribed to treat such a condition.

In August 2010, state agency physician, Dr. Spetzler, reviewed Taylor's allegations and the medical records at the initial level of administrative review. Dr. Spetzler noted Taylor's allegation of a history of chronic back pain in July 2010 and his statement regarding quitting work, but he observed that the medical evidence of record showed just medications for cholesterol and high blood pressure. He further noted that in July 2010, Taylor had a normal range of motion, no edema, he could stand erect, and his gait was steady. Dr. Spetzler further noted that no imaging studies or treatment was ordered at this time. Dr. Spetzler concluded that, despite Taylor's complaints of back pain, as well as pain and numbness in the legs, feet, arms and hands, there was no evidence of significant muscle weakness or nerve damage that would prevent him from working. (R. at

93.) Likewise, in October 2010, Dr. Duckwall arrived at the same conclusion after reviewing Taylor's allegations and his medical evidence on reconsideration. Dr. Duckwall found that Taylor's impairments remained nonsevere for the same reasons that Dr. Spetzler had stated in the initial determination.

The ALJ gave these opinions great weight, noting that the state agency physicians are experts familiar with the Social Security disability program and that they had the opportunity to review the records available at the time of their determinations. (R. at 15-16.) The ALJ further noted that their opinions were consistent with the mostly unremarkable examination findings and conservative management of Taylor's conditions. (R. at 16.) I find that substantial evidence supports the ALJ's weighing of the evidence. Contrary to Taylor's argument, I find that the state agency physicians acknowledged that Taylor had a history of reported chronic back pain and that he stated he was quitting work because he could not tolerate the pain. However, their conclusion that his back impairment was not severe was based on the normal physical examination findings and the lack of treatment for any back impairment contained in the July 2010 treatment note. Such a conclusion is supported by the other evidence of record, as stated herein, which shows that Taylor consistently had normal physical examinations, no imaging studies, no clinical deficits and conservative treatment during the relevant time period to the redetermination decision.

Based on the above, I find that substantial evidence exists in the record to support the ALJ's finding that Taylor was not disabled at any time from June 23, 2010, through February 2, 2011. I also find, for the reasons stated herein, that the Commissioner is entitled to summary judgment on Taylor's claims that the redetermination procedure set forth in 42 U.S.C. § 405(u) violated his due process rights, the Social Security Act or regulations and the APA. An appropriate Order

and Judgment will be entered.

DATED:     February 21, 2018.

_s/ Pamela Meade Sargent_
UNITED STATES MAGISTRATE JUDGE